Anthony Dick, representing Plaintiff Appellant Gene McLenithan. If I could, I'd like to reserve three minutes for rebuttal, please. All right. Counsel, please be advised that the time showing is your total time remaining. Thank you, Your Honor. All right. In the court below, the State vigorously defended its facially discriminatory policy of providing kosher meals only to traditionally Jewish inmates, regardless of the individual inmate's sincerity. The District Court granted summary judgment for the State on that basis, holding that even if a Seventh-day Adventist sincerely believed that he has a religious obligation to follow a traditionally Jewish kosher diet, the State nonetheless is justified in denying that religious accommodation based on a supposed compelling interest in limiting the State's costs. Well, we're now on appeal. There's some concession with regard to the claims for injunctive relief. Is that correct? Yes, Your Honor. So what's left now? The State, after I filed my brief on appeal, and only after I filed my brief on appeal, confessed error and conceded that the District Court was wrong to grant summary judgment in favor of the State. On the injunctive relief claims? On the injunctive relief claims. And you conceded that no damages are available for an Arlupa claim, right? For Arlupa, that's correct, Your Honor. So I'd like to focus this morning on explaining why the District Court was, in fact, required to grant summary judgment in my client's favor on the constitutional claims. So that's the free exercise claim? Free exercise and equal protection. Okay. That's right. So there are two basic constitutional principles that decide this case. The first is that the State is not allowed to prefer one religious faith over another. The government is obligated to treat all religious faiths equally. The second principle is that the State is not allowed to adjudicate religious disputes. If one Seventh-day Adventist says, I have a sincere religious belief that I'm required to follow the Old Testament as understood by the traditionally Jewish tradition of following a traditionally Jewish kosher meal, and the church authorities of the Seventh-day Adventist Church say, no, you're wrong. When Jesus came along in the New Testament and repealed the Old Testament rules, now there's this modified kosher diet. You don't have to follow the traditionally Jewish diet. That's a religious dispute within the church that the State is not allowed to take a position on. The State is not allowed to say the Seventh-day Adventist Church really requires this type of diet and not that one. Under the Constitution, each individual is allowed to decide for himself or herself what the religious beliefs are proper to his or her church. What are the facts that would establish that he had a sincere belief? Well, in this case, the defendants themselves gave him an interview, a personal interview. First of all, they didn't even ask about his sincerity for eight years. When they finally did, they interviewed him. The chaplain gave him a 10 out of 10 sincerity rating as the State concedes. So the defendants themselves have admitted that. But more importantly, this Court doesn't even need to get to the sincerity issue because the equal protection issue can be decided without even getting there based on their facially discriminatory policy that did not even take sincerity into account. I mean, under the Equal Protection Clause, the government is required to treat different religions equally. So when a Seventh-day Adventist inmate and a Jewish inmate come and say we would like a traditionally Jewish kosher religious meal accommodation, the State has to treat them equally and has to look at — And so how did they treat them unequally? Well, the State, instead of looking at individual sincerity, which is what it's supposed to do, and not say what does your religion really require, the State has to say what is your individual belief? Do you have a sincere religious belief? If so, then the State has to treat them equally if they both have the same sincere religious belief in following that practice. And how do they treat them differently? Instead of doing that, the State had a facially discriminatory policy where it said if you are Jewish by birth or by conversion, regardless of your individual sincerity, you will get a kosher Jewish meal, a traditionally kosher Jewish meal. Is that clear, though, as a matter of fact? Absolutely. That in — you are talking about facially. But did those of Jewish faith, did they — Yes, Your Honor. Weren't they required also to establish that they had a sincere belief? No, Your Honor. Not under the policy as written and not in fact. If you look at page 68 — Well, tell me about not in fact. Well, if you look at page 68 of the excerpts of record, that's the facially discriminatory policy. No, she said tell her about as a question of fact. As a question of fact. Well, you could ask the State if they ever denied someone — No, what's in the record to support your assertion — In the record — Could you let me finish my question, please? I apologize, Your Honor. What is there in the record that establishes as a matter of fact that Jewish inmates were not questioned about their sincerity? Two things, Your Honor. On page 53 of the excerpts of record, the declaration of Mr. Bilotti, who was the research director, stated that Jewish inmates received kosher meals upon request. That's why they did not participate in the kosher survey that was given. In addition to that, on excerpts of the record, page 134, in the letter to Mr. McLenathan, they explained because you were not a follower of Judaism, you were not born Jewish, therefore you are rejected, not because of your sincerity, but because you were not born Jewish and you did not convert to Judaism. Well, let's take the first point that you made. You said that merely because they were Jewish that they were entitled to kosher meals. Correct. Why have you assumed that they didn't have to have a sincere belief? They didn't have to establish that they had a sincere belief. I know that there is some possibility that by their lineage and inheritance that they could be, it could be argued that they were Jewish, but that isn't always the case in prison. So it says that, but isn't there in prison an obligation for the individual to establish that that is their religion and sincerely held belief? Yes, Your Honor. If the State were properly following the law, that obligation would exist. I implore you to ask the State whether they ever considered the sincerity of a Jewish inmate who was Jewish by birth and conversion. Well, let's look at the fact. Let's look at the fact. They don't have to establish that on appeal. You have to establish that they never did. Well, Your Honor, when there's a facially discriminatory policy as written, I mean, imagine there were a facially discriminatory policy on the basis of race or on the basis of gender,  I mean, imagine a policy said inmates of one race get better food than inmates of another race. This Court would not say that on a summary judgment record there have to be facts saying, oh, well, did they actually apply it equally. But those are not comparable, because we do have cases that say that Jewish inmates are entitled to a kosher diet. Do you have any cases that say Seventh-day Adventists are entitled to a kosher diet? Well, Your Honor, you have cases that say that if someone has a sincere religious belief that they need to keep kosher diet. But we have cases that say specifically that denial of a kosher diet to a Jewish inmate is a constitutional violation. I'm just asking you, is there a similar case authority regarding Seventh-day Adventists? Your Honor, there's not a case saying that specifically, except arguably for the case in the District of Oregon, the Wofford case. But there are cases saying that if you have a sincere religious belief, then you're entitled to a kosher diet. Well, that's a very general proposition, but we have cases specifically addressing halal diets, and we have cases specifically addressing kosher diets. And I was asked for Jewish inmates. And I was just asking you, is there a similar line of authority involving Seventh-day Adventists? Because it did not appear from the record that that is a traditional tenet of Seventh-day Adventists, that kosher diets are required. Well, that's correct, Your Honor. Your Honor, there's no case specifically applying the law to a Seventh-day Adventist who requests a kosher meal and saying that religious motivation entitles you to that. But there are cases saying that you look to the sincere individual religious belief. It's a matter of individual conscience. It's not a matter of whether — That's still a factual dispute for the trial court. Why is it that he's entitled to summary judgment as a matter of law with regard to sincerity belief? Well, Your Honor, our argument is that there's no need to even reach the issue of sincerity because the unequal treatment occurred before sincerity was even considered. There was a facially discriminatory policy that my client did not even have an opportunity to prove his sincerity. For eight years, they denied him religious accommodation based on his religious affiliation and nothing more without even inquiring into the sincerity. And that's not a factual issue, counsel? Isn't that a factual issue? Why is that — why is that there are undisputed facts to establish that, and then as a matter of law, then he's entitled to it? I understand your equal protection argument, but I don't understand your argument concerning sincere belief and that the facts established in its undisputed facts that, in fact, he was denied it based upon his sincere belief. Yes, Your Honor. Well, there are two different arguments there. So on the equal protection argument, you don't even need to reach the question of sincerity because the court facially discriminated against him regardless of sincerity. So that's on one side. Where's the facts that show that? The facts that show that, as I said, are in the written policy and on page 53 of the excerpts of record and on page 134 of the excerpts of record, which make clear, and I would implore you again to ask the State if they ever — and the State, I think, will concede this — ever screened for individual sincerity when it came to someone who was Jewish by birth or by conversion. And you can show the negative, that they never did? I think the State will concede that. I think it's shown by the policy. Well, no, I'm not asking for the State to concede it. But just based upon the policy, you're saying as a matter of law that they never did? That's correct. And I would say that the record makes that clear. If this Court believes there's a factual dispute on that, it could direct a remand on that specific question. I'm confident that the facts will bear out that the State never, in fact, engaged in the screening of individual sincerity. What about your position on qualified immunity, assuming that we get there? On qualified immunity, again, the law as it exists makes clear that the State is not allowed to discriminate solely on the basis of religious affiliation. And that is the clearly established principle that we think decides this case for qualified immunity on equal protection. But what about their reasonable belief? That's qualified immunity. The reasonable belief — well, the State argues there was a reasonable belief that my client was not sincere, but that's not a valid qualified immunity basis because they didn't even ask about his sincerity. They didn't even look into his sincerity. As a matter of law, you're saying the facts establish that? Correct. You have affidavits that will say we never considered his sincerity. Is that right? That's correct, Your Honor. Because it's your obligation. Correct, Your Honor. And if that's the factual dispute on which this Court would like to remand, we'd be happy to litigate that again below. Okay. I'd like to reserve — I'm sorry. But I just wanted to ask you in view of the fact that there is no clearly established law addressing Seventh-day Adventists and kosher diets, why wouldn't that be a basis for finding qualified immunity? Well, Your Honor, because we don't believe there has to be a case on the exact facts. As this Court has said many times, as long as there's a general principle that clearly establishes, like you can't discriminate against people solely on the basis of their religious affiliation, we think that's clear enough. So, for example — But that's a very high level of generality. Well, I don't think it's the high level of generality when it's conceded that the only difference between him and other inmates was just the fact that he has a different religious affiliation, and that was a sufficient basis for treating them differently. All right. So, for example, if there were a Catholic and a Protestant who both requested a Bible, and the State said, well, we're going to give it to the Protestants and not the Catholics —  Thank you, counsel. Thank you, Your Honor. May it please the Court, Denise Fjord back on behalf of the State defendants. The only issue that's really left in this case is the issue of damages, and we have addressed that by way of qualified immunity. It's our position that at the time that — and it's a time of evolving law, and it's also a time of changing facts. At the time that the decisions were initially made, they were reasonable both under the law and under the facts. Let me stop you on that, since you are focusing on qualified immunity, which is something that I'm interested in. Don't you establish qualified immunity on an individual basis? Yes. And okay. So you'll have to look at every one of the defendants to determine whether or not they acted reasonably, assuming that there's a constitutional violation. Isn't that impossible from the record? Because we don't even know in particular who those individuals were. And then on top of that, we really can't tell whether each and every one of them factually decided or acted reasonably. Well, I think you can make those distinctions. In the supplemental excerpt of record, we have affidavits from one of the defendants, Tom O'Connor, about how decisions were made in general and in particular as to this individual. We also have an affidavit from Dennis Holmes, who was also involved in the decision-making, although he's not a defendant. But let's talk about every one of the individual defendants and take them seriatim. If we look at Defendant Williams and Defendant Newth, Williams was the director of the Department of Corrections. Newth was the superintendent of the institution where Mr. McLenathan was initially housed. He is no longer at that institution. But those two individuals, there's no evidence that they had any role in making determinations as to diet of particular individuals. Mr. O'Connor, Chaplain Toth, and Ms. Prinslow did have a role in making those decisions. What were their roles and why did they act reasonably? Mr. O'Connor was the head of religious services. Mr. Toth was a chaplain at a group of institutions where Mr. McLenathan was housed. And Ms. Prinslow, as I recall, had a supervisory role of some sort over diet generally. She was the food service person, if you will, generally for the Department of Corrections. So she made decisions regarding, you know, how much to spend, what to buy. And in the excerpts of her record, I think there are some pieces, at least of her affidavit, about how decisions were made about how to obtain kosher food in the most cost-effective way and about the cost of that. But in particular, for the appellant, what did they each have to say that establishes they acted reasonably with respect to the appellant? In particular for the appellant, and I would urge you to look carefully at Mr. O'Connor's affidavit, he was the head of religious services until December 2008. And his affidavit states essentially that during that time that he looked extensively at what was required by the beliefs of various religions. Initially, kosher diets were restricted to Orthodox Jewish inmates. During his tenure, they were expanded to include inmates who were professing other types of Judaism. And in the summer of 2008, the district court held as to a particular Department of Corrections inmate that they were required to provide him as a Seventh-day Adventist with a kosher diet. At that point, the Department of Corrections began, excuse me. Counsel, while you're doing that, to me all of those facts seem to go to whether or not there was a violation of constitutional right. By the time we get to qualified immunity, we're assuming that there has been a constitutional deprivation, and we're looking at whether or not the right that was infringed was clearly established at that point. Well, I think we have to, we don't even quite get there with Mr. McLenathan. Because the difficulty and there just isn't the clarity with regards to the facts that counsel would have you believe. He made a claim. Counsel, if you concede that the only issue is damages, then that means liability has been established. The only viable issue is damages. We don't concede that he's entitled to damages. Prior to any damages, we have to have a group. Your position, excuse me for interrupting, your position on appeal is you get qualified immunity, and so that takes care of the claims for damages. Right. Correct. Right. But that assumes that there has been a constitutional violation. If you're at qualified immunity, our law says the doctrine of qualified immunity shields government officials from liability for damages, unless a plaintiff can establish that the official violated a constitutional right and the right was clearly established at the time of the official's alleged misconduct. So what part of that two-pronged test are you challenging? I would say that, and I would agree with Mr. Dick, that the law was, there was law that tended to show that if an inmate could establish a sincerely held belief rooted in religion that required a kosher diet, that that inmate should receive that kosher diet. The difficulty here is that until April of 2009, when he was assessed by Chaplain Topp and approved for a kosher diet, and so logically any of his damages would have to have occurred before that time. And how much time was that? Isn't there some at least, if not nominal damages, couldn't he establish for that period of time based upon his sincerely held belief? And that he suffered something, perhaps, consequential damages? Because if, in fact, it was a sincerely held belief, then being deprived of that may well have caused him harm of some sort. Well, prior to that time, the defendants reasonably believed that it was not a sincerely held belief based on his own statements that he wanted the kosher diet because it tasted better, because there was more variety, because they got holiday foods, which people on the vegetarian diet did not get. But is that as a matter of law? I mean, there's facts to indicate otherwise. So, and there isn't, you don't, once again, you have not established for me that each and every one of those defendants fell within that category. But let me ask you the question that counsel raised about equal protection and the law on its face is unconstitutional, because it provides that Jewish inmates do not have to establish a sincerely held belief, but anybody else has to. What's your position on that? Well, I think that the facts show that Jewish inmates who were orthodox did not have to, essentially being orthodox, establish the sincerely held belief. And why would there, why, okay, you say that. And that would be this Court's case law, starting in 1995, told us that that was required. That what was required? That we were required to give kosher meals to orthodox Jewish inmates who requested it. But in this case, he may well be orthodox, and it's just a different religion, so why would he have to establish it? And counsel says that's a violation of equal protection. All he has to do is establish under constitutional law that, in fact, his beliefs, said Seventh-Day Adventists' beliefs are orthodox, which required, and they were sincere, which required a kosher diet. He didn't establish that, number one. There were questions of fact, as the district court recognized. There were questions of fact about the sincerity of his belief, and those go directly to the reasonableness of the defendant's decision. If there are questions of fact concerning the sincerity of his belief, why is this not a remand for trial on those issues? From your briefing, I take it that the State's position is that, look, the law was clearly established at the time that you can't discriminate or have a discriminatory policy that's enforced with regard to one religion versus the other. But we were entitled to basically question the reasonableness of his belief. I take it that's your position, right? That is our position. What evidence is there in the record that at the time he made his request, there was an evaluation as to the sincerity of his belief? Because to me, the record suggests that there was an enforcement of the policy in place, rather than really questioning the sincerity of his belief, which came much, much later. Is there some record sites that you can direct me to? I think if you look at the O'Connor affidavit, which is the first item in the supplemental excerpt of record, Mr. O'Connor indicates that he did extensive consultation about what the tenets of Seventh-day Adventists were, what they required, what their diet required. Now, I realize that the law protects people who are not necessarily in the mainstream. It does protect idiosyncratic beliefs. But we're dealing with a prison population of, and as the affidavit describes, of people who are not necessarily honest, who are manipulative. We know Mr. McLenathan was lying about, at least about his use of canteen items that were not kosher. Is this evidence, an evaluation done at the time the decision was made to deny him the kosher meals? Or is this after the fact? This was evaluation that was being done at the time that he was making his request for kosher meals. So what are the best facts you have that are undisputed? Because that's what we're dealing with here, that establish he did not have a sincere belief. The best facts would be that he didn't state that it was belief-based. He stated that the food was better and had more variety, and that's why he wanted it. And there was nothing that was, that were facts that would dispute that? I don't believe that it's disputed that at the time that's what he was saying. Well, you said that, but he also said he had a sincere belief. Why isn't that an issue for the judge to decide on remand? He said he had a sincere belief in April of 2009 to Chaplain Toth, and at that point he was approved for the kosher diet. We're talking about before April of 2009. What was he communicating? He was communicating at most mixed messages about, he didn't know anything about the law of kosher. They talked to him about that. They didn't know anything about the religious basis of it. He said the basis of his belief was the Bible. The Bible is not the source of the kosher laws, at least not in large measure. And he was ordering and consuming, as far as we know, canteen items that were not only not kosher, but not healthy within the SDA-type diet. And so either he was consuming food that was not kosher, or he was getting it for somebody else and lying about it. Which reflects directly on his honesty. Beyond my time, I'm glad to answer any other questions, but I am way beyond my time. Yes, you are, counsel. Rebuttal. Thank you. Thank you very much, Your Honor. The State concedes that the law was clearly established, and I think it goes back to the 1980s, that the proper way to deal with one of these claims is to look at individual religious sincerity, not to look at what the tenets of the religion requires, as established by the church authorities. So if you go back to cases like Thomas v. Review Board, Hernandez v. Commissioner, and in this court, Malik v. Brown, which was 1994, the way to proceed on these things if you're the State is to look at the individual conscience and sincerity of the believer, and not to look to the authorities of the church to say whether we need to do this accommodation. So when the State points to the declaration of O'Connor, the religious services director or administrator, and says here's what they did, they looked at the tenets of the religion. They did not look at the individual sincerity of my client until 2008. So what are the disputed issues of fact in response to counsel that the trial court needs to resolve in terms of whether or not your client had a sincere belief? On the qualified immunity issue, the only issue of fact is whether they ever looked at my client's individual sincerity at all, which I think the record clearly establishes that they did not. When you say they, we look at every one of the defendants. Correct. Are there any of them that did? Not a single defendant looked at my client's religious sincerity between the time he asked for kosher diet in 2000 and 2008. September 2008, Chaplain Toth interviews my client to gauge his sincerity. The first time my client ever got any individual assessment of his sincerity, and Chaplain Toth gives him that survey and gives him a 10 out of 10 sincerity rating. The defendants themselves, nonetheless, they still continue to apply their facially discriminatory policy until April of 2009, after my client files a Federal lawsuit. It's not until after my client files a Federal lawsuit. Six months, seven months after they've already said we give you a 10 out of 10 sincerity rating, they continue to apply their facially discriminatory policy. On qualified immunity, they had to have actually reasonably believed, after looking at his individual sincerity, that he was not sincere. They didn't even look at it between 2000 and 2008. When they finally did, they gave him a 10 out of 10 sincerity rating. They continued to apply the facially discriminatory policy. Each defendant? Each defendant. No defendant ever at all looked at his individual sincerity between 2000 and 2008. And the record establishes that? The record establishes that with 100 percent clarity. If you look at the page on the State's brief where they say here are all the reasons, you know, they looked at his canteen purchases. They looked at what he said when he requested it. None of that was ever done until after he filed a Federal lawsuit, and they started coming up. But that counts, though. I mean, we don't disregard that, do we? You do disregard it for purposes of qualified immunity. And whether they acted reasonably at the time, between 2000 and 2009, when none of them even considered, they just applied a facially discriminatory policy. They never even considered his individual sincerity. They concocted a post hoc defense, a post hoc justification in 2009 after he filed a pro se lawsuit against them. After, in 2008, they made a settlement with a different inmate saying we promise we're going to stop this. We promise we're going to stop facially discriminating. We promise we're going to look at individual sincerity. They entered that settlement in 2008 with Mr. Wofford. Then my client came along and said, okay, can I have the benefit of that? Can you look at my individual sincerity? They interviewed him. They said you're sincere. They continued to apply a facially discriminatory, an egregiously unconstitutional, facially discriminatory policy until after he filed a Federal lawsuit. Let me return to that again because I wasn't quite clear. What is in the record that would show that, despite the wording of that statute concerning those of the Jewish faith, that they never required anyone who claimed to be Jewish to establish that, in fact, they had a sincere belief? So what I'm asking is, is can any prisoner say I'm Jewish and then not have to establish a sincere belief? In the record it said that if a Jewish representative, a rabbi, would certify that they were Jewish by birth or by conversion, so if you were born Jewish, that was all they had to show. So we know statistically 80% of the Jewish population in the United States does not keep kosher. It doesn't matter. For 80% of the Jewish population that doesn't keep kosher, they were giving them kosher meals because they were born Jewish upon request, regardless of sincerity. My client had, by contrast, a sincere belief. He was denied, regardless of his sincerity. He didn't even get an opportunity to prove his sincerity. And so I think when you look at qualified immunity, you have to say, were they acting reasonably? Were they following the very simple, very clearly established principle? We look at individual sincerity. We don't look to what the elders in the Seventh-day Adventist Church say. We don't have the kind of society where the state gets to say who has the correct belief about what Seventh-day Adventism requires. We look to the individual religious conscience. That's what religious liberty is all about. That's what the Equal Protection Clause and the First Amendment require. The state disregarded that very basic principle for over nine years and denied my client his clearly established constitutional rights. We ask that you please reverse the district court and grant summary judgment in my client's favor. Thank you very much. All right, counsel, thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: Rawlinson, Nguyen, Silver